

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PROTECTION STRATEGIES, INC.,

    Plaintiffs,

-v-

STARR INDEMNITY & LIABILITY CO.,

    Defendants.

Civil Action No. 1:13-CV-00763

## MEMORANDUM OPINION

### I. Overview

Before the Court are two cross-motions for summary judgment: Defendant Starr Indemnity & Liability's Motion for Summary Judgment on its counterclaim against Protection Strategies (Dkt. No. 50) and Plaintiff Protection Strategies' Motion for Partial Summary Judgment on the Duty to Defend (Dkt. No. 53). Four other motions filed in this case (Nos. 72, 77, 78, 80) are now moot as a result of the voluntary dismissal of third-party defendants Hedman, Sanborn, Richards, and Lux. The parties have opposed each other's motions for summary judgment (Dkt. Nos. 60, 61), and both parties have replied in support of their respective motions (Dkt. Nos. 71, 73). The Court has reviewed the pleadings in this case and heard oral argument on March 14, 2014, and for the reasons stated in open court and those set forth herein, the Court issues this opinion granting the Defendant's motion and denying the Plaintiff's motion.

## II. Background

Plaintiff Protection Strategies, Incorporated ("PSI") is a global security management and consulting company. In February 2011, PSI purchased a one-year "Resolute Portfolio for Private Companies" insurance policy from Defendant Starr Indemnity & Liability Company ("Starr") to protect itself and its officers from various liabilities and claims, and the cost of litigating and defending those claims ("the 2011 Policy"). The 2011 policy covered all Claims made between February 6, 2011 and February 6, 2012. PSI purchased a renewal of that policy (with several alterations) in February 2012, which provided PSI coverage for Claims made between February 6, 2012 and February 6, 2013 ("the 2012 Policy").

The Directors & Officers Liability ("D & O") Coverage section of the policies provided PSI with coverage for three major categories of losses: (1) Losses incurred by an "Insured Person" (i.e. an executive or employee of the company) in response to a Claim against that person, (2) Losses incurred by the "Insured" (i.e. PSI itself) to indemnify Insured Persons against Claims, and (3) Losses incurred by the Insured arising from Claims against the Insured itself. In this case, PSI's defense costs implicate categories (2) and (3), because PSI has sought coverage for indemnification of its Officers as well as defense costs for its own defense.

On January 30 and 31, 2012, PSI received a subpoena from the NASA Office of the Inspector General ("NASA OIG") and a search and seizure warrant issued by the United States District Court for the Eastern District of Virginia (Dkt. Nos. 51-4, 51-5). The warrant specifically stated that the government was seeking evidence of "violations of 18 U.S.C. §§ 287 (false claims), 371 (conspiracy), 1001 (false statements), 1031 (major government fraud), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy), as well as 15 U.S.C. § 645 (false statements to the Small Business Administration)." On February 1, 2012, NASA OIG executed a search of

PSI's headquarters in Arlington, Virginia, seizing hundreds of boxes of records, hard drives, and other files. In addition to the company itself, several of PSI's current and former officers were informed that they were also individually targets of the NASA OIG investigation. On February 10, 2012, PSI sent notice of the NASA OIG investigation directly to Starr's underwriter. Starr's underwriter acknowledged receipt, but directed PSI to send notice of its claim to LVL Claims Services ("LVL"), Starr's claims handler, per the instructions in the policy. Two weeks later, PSI forwarded notice of its claim to LVL.[1] Starr sent PSI a reservation of rights letter and began reimbursing PSI for the defense costs PSI incurred indemnifying its officers.

On June 14, 2012, PSI received a letter from the United States Attorney for the Eastern District of Virginia indicating that, along with the Department of Justice, it was investigating PSI for purposes of civil liability in connection with PSI's participation in the Small Business Administration Section 8(a) program. PSI informed Starr of this development.

The individual PSI officers being investigated, which both parties agree are "Insured Persons" under the policy, have each been represented by separate counsel throughout the investigation. PSI retained the law firm Dickstein Shapiro to represent the company itself and to coordinate its overall response to the investigations. Starr initially took the position that the investigation did not constitute a "Claim" with respect to PSI itself, because it did not meet the definition of Claim in Paragraph 2 of the D & O Liability Coverage Section. However, this Court's September 10 Order (Dkt. No. 29) confirmed that the search warrant and subpoena *did* create a "Claim" against PSI even in the absence of formal criminal prosecution, and Starr has since complied by reimbursing PSI for its defense costs. As of the date of Starr's counterclaim,

---

[1] The Court finds that while the insurance agreement did require PSI to give notice of a claim to LVL Claims Services (and not directly to Starr), *see* 2011 Policy "General Terms" ¶ 5 & Declaration 9, Starr's obligation to pay PSI's defense costs was nonetheless triggered on February 10, 2012 when they had actual notice of a claim. However, because this Court also finds that Starr is entitled to recoupment of the defense costs it advanced to PSI, this finding does not result in Starr owing any further defense costs to PSI.

3

Starr had advanced over $670,000 to PSI for defense costs incurred by PSI itself, and by its Officers Hedman, Lux, Richards, and Sanborn.

The investigation of PSI and its Officers continued through 2012 and in 2013, four of PSI's Officers entered plea agreements in the Eastern District of Virginia to crimes including major fraud against the United States, conspiracy to commit fraud, and bribery in connection with PSI's violations of the SBA Section 8(a) program. PSI's former CEO Keith Hedman entered a plea agreement in March 2013 to a two-count criminal information of major fraud against the United States and conspiracy to commit bribery in violation of 18 U.S.C. §§ 1031 & 371, which became final at his sentencing on June 25, 2013. His plea stated that along with others at PSI, Hedman created a shell company ("Company B") to obtain Section 8(a) certification and win contracts that PSI would not otherwise have qualified for. Hedman admitted that Company B received over $31 million in U.S. government contracts as a result of the scheme, with over $5 million of those funds flowing to PSI. Each PSI Officer's guilty plea stipulated that the Officer *knowingly and willfully* took actions in furtherance of this fraud from approximately 2003 until the investigation began in 2012.

Although the parties debate when Starr became aware of the guilty pleas, on September 27, 2013 Starr filed a motion for leave to amend and to file a supplemental response to PSI's complaint (Dkt. No. 31). The motion was opposed by PSI but was granted by Judge Davis on November 1, 2013. On November 4, 2013 Starr filed its amended answer and complaint/third-party complaint, seeking a declaratory judgment against PSI and its four Officers and recoupment of all defense costs on the basis that the guilty pleas rendered the entire investigation excluded from the insurance policy.[2] The third-party defendants all having been dismissed, Starr

---

[2] The Court does not find that the timing of Starr's amended answer and counterclaim bars its recovery in this case. Because the guilty pleas of PSI's executives were not final until final judgments were entered in summer 2013, the

4

now seeks summary judgment against PSI on each count of its counterclaim. PSI has moved for partial summary judgment on Starr's duty to defend.

### III. Analysis

In its September 10, 2013 Order, this Court held that the NASA OIG search warrant and subpoena directed at PSI constituted a "Claim" as that term is defined in Section 2(a) of PSI's Directors & Officers Liability insurance policy. Therefore, to the extent that the Claim was not otherwise excluded from the insurance policy, the Court found that Starr had a duty to defend not only PSI's individual directors, but also PSI itself. Starr has since amended its answer to add a counterclaim against PSI seeking, primarily, recoupment of all funds it advanced to PSI for its defense in the NASA OIG Investigation. The Court now considers whether, in the wake of the PSI officers' guilty pleas, the entire investigation falls within the policy's exclusions. After considering the pleadings and the exhibits in this case, the parties' arguments before the Court, and applicable Fourth Circuit law, the Court finds that the policy's exclusions apply and are a complete bar to coverage for the investigation of PSI and its Officers. Because the entirety of the defense costs advanced by Starr fell under the exclusions in the policy, Starr is entitled to recoupment.

### A. The 2011 Policy Applies

It is undisputed that the search and seizure warrant and the NASA OIG subpoena were executed and served on February 1, 2012. It is also undisputed that February 1 was within the

---

exclusions in the policy (and consequently, Starr's right to recoupment) were not triggered until that time. Starr maintains that it moved to amend its answer after it learned of the final judgments in late August 2013. Although PSI contests Starr's assertion, it has not provided any legal justification for denying Starr's recoupment claim on that basis. Starr sought and was granted leave to amend its complaint, and its counterclaim is therefore properly before this Court.

5

coverage period of the 2011 Policy, which ran from February 6, 2011 until February 6, 2012. The coverage period of the 2012 Policy began on February 6, 2012. Sections 1(B) & (C) of the D & O Policy state clearly that the policies PSI purchased are "claims made" policies.[3] Importantly, the policies define a "Claim" as the written demand or judicial, administrative, or regulatory proceeding that is initiated *against the Insured*; not as the communication between the Insured and the Insurer. Therefore, the "Claim" in this case was first made, at the latest, on February 1, 2012 when PSI became the target of a search and seizure warrant and a subpoena from the federal government. The policies also specifically provide that subsequent, related claims relate back to the date that the first claim was made. Thus, once the Insurer has received notice of a Claim, "a Claim which is subsequently made against an Insured or reported to the Insurer . . . alleging, arising out of, based upon or attributable to the facts alleged in the previously noticed Claim . . . shall be considered related to the previously noticed Claim." General Terms & Conditions § 5.

Therefore, the only issue regarding the application of the policies is whether the nine day delay between the February 1 execution of the search and seizure warrant and subpoena and the February 10 notice to Starr triggers the 2012 Policy, which began on February 6. The Court finds that it does not. The NASA OIG Investigation was a claim "first made" no later than February 1, 2012, during the coverage period of the 2011 Policy, and any claims that followed relate back to that date because they arose out of the same facts and circumstances as the original Claim. PSI's argument that *both* the 2011 and 2012 policies apply is contrary to both common sense and the clear language of the insurance policy. A claim is only "first made" one time, and the language of the policy nowhere suggests that there are circumstances under which a single claim could

---

[3] Both policies state that the Insurer shall pay losses arising from claims "first made during the policy period . . . against any Insured Person" or "against the Company," provided the claims are properly reported to the Insurer. D & O Policy § 1(B)–(C).

6

simultaneously be covered by more than one insurance policy.

PSI's argument that Starr waived its right to deny coverage under the 2011 Policy is also unavailing. Although Starr's initial reservation of rights in March 2012 (as well as its internal records from that time) exclusively referenced the 2012 Policy, PSI has not introduced any evidence, aside from its own speculation, to demonstrate that Starr knew at that time that the search warrant and subpoena were executed against PSI on February 1, 2012. In its December 12, 2012 letter Starr revised its position, stating that a November 27 communication from PSI was the first time Starr learned that February 1 was the date of the search, and therefore that "it appears that a Claim against certain individuals was first made during the Policy Period of the 2011 Policy." Dkt. No. 51-32. In the absence of any evidence contradicting Starr's account, Starr cannot be said to have waived its rights under the 2011 Policy before it became aware of facts demonstrating that the 2011 Policy applied. The Court finds that the Claim in this case was "first made" on February 1, 2012; all subsequent claims arising out of the same investigation related back to the time the first claim was made, and Starr did not knowingly waive its right to deny coverage under the 2011 Policy. Therefore the 2011 Policy, not the 2012 Policy, applies.[4]

## B. The Exclusions Cited by Starr Bar Coverage of this Claim

Starr argues that the PSI Officers' guilty pleas trigger four exclusions in the 2011 insurance policy it sold to PSI. Three of these exclusions are incorporated into the Directors & Officers Liability Coverage Section of the policy: Exclusion 3(a) ("Profit Exclusion"), Exclusion 3(b) ("Fraud Exclusion"), and Exclusion 3(d) ("Prior Knowledge Exclusion"). The fourth "exclusion" claimed by Starr is based on the Warranty and Representation Letter attached to the

---

[4] Although the Court is persuaded that the 2012 Policy is inapplicable to this coverage dispute, it nonetheless finds that this Claim is excluded from *both* the 2011 and 2012 Policies under the exclusions cited by Starr. Therefore, even if the 2012 Policy (or both policies) applied, Starr would still be entitled to recoupment.

7

2011 Policy, dated February 11, 2011 and signed by Keith Hedman, PSI's then-President and CEO (Exh. 43-1). The Court finds that under the circumstances of this case, in which PSI seeks coverage for defense costs directly related to a massive scheme to defraud the U.S. government, each of the exclusions cited by Starr functions as a complete bar to coverage for PSI's claim.

After PSI received a letter from the U.S. Attorney for the Eastern District of Virginia in June 2012 stating that the U.S. Attorney and the Department of Justice were investigating PSI's participation in the Small Business Administration Section 8(a) program, the investigation continued and eventually targeted four of PSI's executives for criminal liability—Keith Hedman, Joseph Richards, David Lux, and David Sanborn. Throughout the investigation, PSI indemnified those officers and Starr reimbursed PSI for those defense costs. In March 2013, PSI's executives entered into plea agreements in the Eastern District of Virginia. Hedman pleaded guilty to a criminal information charging him with major fraud against the United States and conspiracy to commit bribery. Lux, Richards, and Sanborn pleaded guilty to conspiracy to commit fraud (Lux and Richards) and major fraud against the United States (Sanborn). In June and July 2013, final judgments were entered against PSI's four executives, and each was sentenced to a term of incarceration.

In his plea agreement, Mr. Hedman stipulated that he and others "engaged in and executed a scheme from approximately 2003 through in or about February 2012 to defraud the Small Business Administration ("SBA"), NASA, the Department of Defense ("DoD"), the General Services Administration ("GSA"), the U.S. Department of Homeland Security ("DHS") (including the U.S. Coast Guard ("USCG")), and other government agencies" by essentially creating a sham company ("Company B") under the control of Hedman and PSI and falsely representing that Company B was eligible for SBA contracting preferences. Hedman Statement

of Facts, Dkt. No. 43-3, at 2. The statement of facts states that as a result of the scheme, Hedman and others wrongfully procured at least $31.8 million in payments on U.S. government contracts. *Id.* Hedman further stipulated that he agreed to pay a U.S. government official in exchange for assistance in helping Company B fraudulently obtain government contracts. *Id.* He agreed that he "was aware of the illegal activities" described in the statement of facts, including those engaged in by Sanborn, Richards, and Lux. *Id.* at 2–3. Finally, Hedman stipulated that his actions "were done willfully, knowingly, and not because of accident, mistake, or innocent reason." *Id.* at 26.

Under the heading "Exclusions," Section 3 of the 2011 Directors & Officers Liability Policy purchased by PSI conspicuously provides the following:

> "This policy **shall not cover any Loss** in connection with any Claim . . .
>
> > (a) arising out of, based upon or attributable to the gaining of any profit or advantage or improper or illegal remuneration if a final judgment or adjudication establishes that such Insured was not legally entitled to such profit or advantage or that such remuneration was improper or illegal ["Profit Exclusion"];
> >
> > (b) arising out of, based upon or attributable to any deliberate fraudulent act or any willful violation of law by an Insured if a final judgment or adjudication establishes that such act or violation occurred ["Fraud Exclusion"];
> >
> > . . . .
> >
> > (d) alleging, arising out of, based on or attributable to any facts or circumstances of which an Insured Person had actual knowledge or information of, as of the Pending or Prior Date set forth in Item 6 of the Declarations as respects this coverage section, and that he or she reasonably believed may give rise to a Claim under this policy ["Prior Knowledge Exclusion"]."

(emphasis added). The policy also states that in determining the applicability of Exclusions (a) and (b) above, "the knowledge possessed by, or any Wrongful Act committed by, an Insured Person who is a past or current [chief executive officer] . . . shall be imputed to the Company." Thus, if Exclusions (a) or (b) would operate to bar a Claim by PSI's chief executive officer, they would also bar a claim on the same facts made by PSI itself.

9

*1) The Profit and Fraud Exclusions*

The first exclusion cited by Starr categorically excludes from coverage under its policy claims that arise out of the "gaining of any profit or advantage or improper or illegal remuneration" when such profit or remuneration is established by a final judgment (the "Profit Exclusion"). The second, similar exclusion excepts claims that arise out of "any deliberate fraudulent act or any willful violation of law by an Insured" if the act or violation of law is established by a final judgment (the "Fraud Exclusion"). The Court finds that both of these exclusions unambiguously apply to the Claims in this case. Mr. Hedman's plea agreement clearly establishes that PSI and its executives knowingly, intentionally, and improperly gained an advantage and illegal remuneration of at least $31 million by fraudulently creating Company B and representing that it was eligible for the SBA Section 8(a) program. It also establishes that PSI's officers (all "Insured Persons" under the policy) willfully violated the law by committing fraud against the U.S. government. Neither party contests that each plea agreement is a "final judgment or adjudication," nor is it disputed that under the terms of the policy, Mr. Hedman's knowledge and wrongful acts are imputed to PSI itself. Because the Claims against PSI and its executives involve precisely the type of loss contemplated by the Profit and Fraud Exclusions, the Court finds that the Claims are not covered by the 2011 Policy.[5]

Although PSI appears to agree that the Profit and Fraud Exclusions were triggered by final judgments against Hedman and the other officers, it argues that the exclusions only apply to losses from that point forward—in other words, that Starr cannot recoup any of uncovered losses for which it had already reimbursed PSI when the judgments became final. The Court finds this argument unpersuasive. The clear language of the policy states that it does not cover "*any* Loss

---

[5] As observed *supra* in note 4, because the 2012 Policy also contains the Profit and Fraud Exclusions, the Court finds that the Claims would also be uncovered under that policy.

10

in connection with" an excluded claim. D & O Policy § 3 (emphasis added). PSI's narrow construction of the exclusions would read this language out of the contract by requiring Starr to routinely cover potentially staggering losses that its policy expressly excludes from coverage, without the possibility of recoupment. While the policy language requires a "final judgment or adjudication" to *trigger* the Profit and Fraud exclusions, it nowhere suggests that the timing of that final judgment affects the insurer's obligation to pay. Rather, the exclusion "either occurred or it did not . . . that the exclusions identify [a triggering event] does not restrict the consequences of the exclusions." Starr Opp. to PSI Mot. for Summary Judgment, Dkt. No. 60, at 17. Therefore, the Profit and Fraud Exclusions operate to completely exclude each of PSI's Claims from coverage under the 2011 Policy.[6]

*2) The Prior Knowledge Exclusion*

PSI's claim is also excluded from coverage by the Prior Knowledge Exclusion in the 2011 Policy. This exclusion bars coverage of any Claim arising out of "any facts or circumstances of which an Insured Person had actual knowledge or information of [at the inception date of the policy] . . . that he or she reasonably believed may give rise to a Claim" under the policy. D & O Policy § 3(d). Based on the statement of facts accompanying each guilty plea, it is evident that each of the four PSI officers charged had actual knowledge in February 2011 of an ongoing scheme to defraud the government by taking advantage of the SBA Section 8(a) program. Given this undisputed knowledge, it can be said that the officers should reasonably have believed that a claim would result under the D & O Policy. *See Bryan Bros. Inc. v. Continental Cas. Corp.*, 704 F. Supp. 2d 537, 541 (E.D. Va. 2010) (holding that, as a matter of law, "such intentional, illegal acts clearly demonstrate knowledge of a basis for a claim").

---

[6] For additional discussion of Starr's right to recoupment as a remedy in this case, see *infra* Section III(C).

Finally, it cannot be disputed that the Claim in question "aris[es] out of" and is "based upon" the fraudulent scheme of which PSI's executives were aware.

PSI's argument that the Prior Knowledge Exclusion does not exclude PSI's own defense costs (or the defense costs associated with uncharged employees of PSI) results from a strained and constricted reading of the text of the policy. Section 3(d) plainly excludes *any Loss* in connection with *any Claim* that arises from facts of which an Insured Person was aware at the inception of the policy. PSI correctly points out that its defense costs included not only the indemnification of its four officers, but also losses associated with its own attorneys and attorneys hired for several uncharged PSI employees: Apatoff, Henderson, and Bickmore. However, PSI does not argue that there was ever a "Claim" against any of those employees as that term is defined in Section 2(a) of the D & O Policy. Rather, it appears that those employees were merely questioned as a part of the investigation of the charged officers; PSI cannot demonstrate that they were ever themselves the targets of an investigation.

Moreover, the losses that resulted from the Claim against PSI itself (and from any hypothetical claims against Apatoff, Henderson, and Bickmore) are *still* excluded from coverage under the 2011 Policy because they are "based upon or attributable to" facts of which an Insured Person had actual knowledge at the inception of the policy. The Court rejects PSI's argument that the "severability clause" found in Section 3 limits the application of the Prior Knowledge Exclusion. While the severability clause *expands* the application of the three exclusions that precede it, it does not *limit* the application of the exclusions that follow it. The unambiguous language of the Prior Knowledge Exclusion provides that *any Claim* is excluded when it arises from facts of which an Insured Person was aware; the exclusion is not limited to the specific Claim made against that particular Insured Person. The Court therefore finds that the Prior

12

Knowledge Exclusion in the 2011 Policy bars coverage for the entirety of this investigation into PSI and its employees.

*3) The Warranty Letter*

Coverage for the investigation into PSI and its employees is similarly barred by the Warranty and Representation Letter attached to the 2011 Policy. In that letter, dated February 15, 2011, PSI (through its then-CEO Keith Hedman) represented that "[n]o person or entity proposed for insurance under the policy referenced above has knowledge or information of any act . . . which might give rise to a claim(s), suit(s) or action(s) under such proposed policy." Warranty Letter to 2011 Policy, Dkt. No. 43-1. The Letter further stated that if any such "knowledge or information exists, then . . . any claim(s), suit(s) or action(s) arising from or related to such knowledge or information is *excluded* from coverage." *Id.* (emphasis added).

PSI points out that the Warranty Letter was signed on February 15, 2011 (nine days after the 2011 Policy went into effect) and argues that it therefore cannot be considered a part of the 2011 Policy. However, the Court has carefully reviewed the circumstances under which the Letter was executed (including the email traffic from February 7 – February 9, Dkt. Nos. 60-3, 60-4) and finds that it is a part of the final 2011 Policy. The emails conclusively demonstrate that PSI bargained for more D & O coverage and that Starr conditioned that enhanced coverage on the execution of the Warranty Letter. The Warranty Letter thus became a part of the Application on which Starr relied when it sold the policy, and PSI cannot dispute that Mr. Hedman made a material misrepresentation when he certified in the Letter that "no person" at PSI had knowledge of facts that might give rise to a Claim. Because Starr relied on Hedman's misrepresentation when it granted the final 2011 D & O Policy, the terms of the Warranty Letter preclude coverage

13

for the entire investigation against PSI and its officers.

### C. Recoupment is an Appropriate Remedy in this Case

Under the clear terms of the insurance policy, and under recent Fourth Circuit precedent, Starr is entitled to recoupment of all defense costs it advanced to PSI related to this investigation. The 2011 Policy expressly provides for recoupment as a remedy in Section 6 of the General Terms & Conditions. That section states that the Insurer "shall pay defense costs prior to the final disposition of any Claim," but that "[i]n the event and to the extent that the Insureds shall not be entitled to payment of such Loss under the terms and conditions of this policy, such payments by the Insurer *shall be repaid to the Insurer* by the Insureds." General Terms & Conditions § 6 (emphasis added). Because PSI was not entitled to coverage for any losses arising out of these Claims for the reasons described above, the recoupment provision applies.

None of the case law cited by PSI supports its conclusion that recoupment is a categorically inappropriate remedy in a duty to defend policy. To the contrary, many courts have indicated that where a duty to defend policy contains an express, written recoupment provision, an insurer may be entitled to reimbursement of defense costs. *See, e.g., Huntsman Advanced Materials LLC v. OneBeacon America Ins. Co.*, 2012 WL 480011, at *10 (D. Idaho Feb. 13, 2012) (Idaho law) ("[A]n insurer may only recoup its defense costs[] if it has included an express provision for reimbursement in the terms of the policy."); *American & Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 529 (Pa. 2010) (Pennsylvania law) (finding that under a duty to defend policy, reimbursement was precluded "absent an express provision in the written insurance contract"); *Medical Liability Mut. Ins. Co. v. Alan Curtis Enterprises, Inc.*, 285 S.W.3d 233, 235 (Ark. 2008) (Arkansas law) (collecting cases to demonstrate that under both the

majority and minority views, the right to recoupment is only in question "in the absence of an express agreement in the insurance contract"). *See also Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1091–92 (10th Cir. 2010) (finding that under Colorado law, reservation of the right to recoupment in an insurer's reservation of rights letter is sufficient even in the absence of a right to recoupment in the insurance policy).

The Fourth Circuit recently upheld an insurer's right to recoup all defense costs on similar facts in *Farkas v. Nat'l Union Fire Ins. Co.*, 861 F. Supp. 2d 716 (E.D. Va. 2012) (Brinkema, J.), *aff'd*, 518 F. App'x 178 (4th Cir. 2013). In *Farkas*, a D & O insurer advanced defense costs to the chairman of the insured company, who was ultimately convicted of fraud and conspiracy to commit fraud. On the basis of those proceedings, the insurer informed Farkas that the convictions triggered the fraud and profit exclusions in the insurance policy. The insurer sought reimbursement for the nearly $1 million in funds it advanced for Farkas' defense, based on the presence of an express recoupment provision in the policy. This Court (by reasoning adopted by the Fourth Circuit) rejected the insured's argument that the policy's exclusions only applied prospectively. The Court stressed that in light of the convictions, "Farkas' conduct was never actually covered under the policy, and he was therefore never entitled to the monies advanced to him." 861 F. Supp. 2d at 722. Because the insurance policy clearly provided that the insurer was not required to make "*any* payment" for an excluded claim, the insurer was entitled to reimbursement. *Id.* Although PSI attempts to distinguish *Farkas* on the basis that it was not a "duty to defend" policy, Judge Brinkema's reasoning applies equally here because PSI's claim was entirely uncovered and the contract specifically contemplated a right to recoupment.

Thus, although there is a split among courts regarding whether a *reservation of rights letter* is sufficient to reserve a right to recoupment not found within the insurance contract, the

cases uniformly suggest that recoupment is an available remedy when it is expressly written into the policy. While express recoupment provisions may be uncommon in duty to defend policies, ultimately "[a]n insurance company's duty to defend is part of its contractual obligation and is defined by the language of the insurance policy." *ABT Building Products Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 135 (4th Cir. 2006). Under Virginia law, unless the parties' agreement is forbidden by law or public policy, courts will not disturb the freedom of contract between sophisticated parties such as those in this case. *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006). Therefore, because the language of the policy PSI purchased clearly reserves Starr's right to recoupment in the event that the insured was not entitled to coverage, Starr is entitled to be reimbursed for the uncovered defense costs it advanced to PSI.

Although the 2011 Policy does contain a 100% Allocation Provision, 2011 Policy Endorsement 7, it does not provide a basis for PSI to avoid recoupment in this case. Endorsement 7 provides:

> "(a) If both Loss covered under this policy and Loss not covered under this policy are incurred by the Insureds on account of any Claim because such Claim against the Insureds includes **both covered and uncovered matters and/or parties** . . .
> (i) . . . One hundred percent (100%) of reasonable and necessary Defense Costs incurred by the Insured on account of such Claim will be considered covered Loss."

(emphasis added). The Allocation Provision clearly states that in cases of *mixed claims* (that is, individual claims in which some matters or persons are covered by the policy while others are not), Starr is obligated to cover its insured's defense costs in full. However this case does not present any "mixed" claims. PSI has not presented any evidence from which the Court could conclude that there were "Claims" against any party other than Hedman, Richards, Sanborn, Lux, and PSI itself. And as explained above, those Claims are each completely excluded from coverage under the 2011 Policy (and the 2012 Policy). Moreover, even if PSI could demonstrate

16

that there were Claims against any of its other employees, all losses flowing from those claims would be "in connection with," "arising out of," and "attributable to" the uncovered Claims—and therefore uncovered themselves under the terms of Section 3.

## IV. Conclusion

After reviewing the pleadings and the record in this case and considering the parties' arguments before this Court, for the reasons stated above, the Defendant's motion for summary judgment is **GRANTED**, and the Plaintiff's motion for partial summary judgment is **DENIED**. An order will follow.

April 23, 2014
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge